MERKER COUNTER COMPANY, Inc., Appellant,

v.

CENTRAL COUNTER COMPANY, Appellee.

Patent Appeal No. 6840.

United States Court of Customs and Patent Appeals.

Dec. 12, 1962.

Worley, Chief Judge, dissented.

Atkins & Law, James Atkins, and Russell L. Law, Washington, D. C., for appellant.

Submitted on record by appellee.

Before WORLEY, Chief Judge, and RICH and SMITH, Judges, Associate Judge JOSEPH R. JACKSON, Retired, and Judge WILLIAM H. KIRKPATRICK.*

RICH, Judge.

This appeal is from the decision of the Patent Office Trademark Trial and Appeal Board (130 USPQ 44) granting a petition to cancel Reg. No. 626,272 of May 1, 1956, of the trademark "Mel-O-Top" for shoe counters, issued to Merker Counter Company, Inc., the appellant.

The petitioner, Central Counter Company, a Missouri corporation, based its petition on its ownership of Reg. No. 330,089, of November 19, 1935 (renewed November 19, 1955), of the trademark "MELOFLEX" for counters for shoes.

During its initial time for taking testimony petitioner took none and introduced no evidence other than its aforesaid registration. After the expiration of that testimony period, respondent filed, pursuant to Rule 2.132(b) of the Trademark Rules of Practice, a motion for judgment dismissing the petition "on the ground that upon the law and the facts petitioner has shown no right to relief." Simultaneously respondent filed a notice under Rule 2.123(c) that it would rely on eleven third-party registrations and two pending applications of record in the Patent Office.

* United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge

Petitioner filed a memorandum opposing the granting of the motion to dismiss, respondent replied thereto, and, after due consideration thereof, the board denied the motion, reset testimony periods for respondent and for petitioner's rebuttal, and stated that it had concluded that the "case should continue to final hearing for a full consideration of the merits in connection with arguments of the parties and any evidence respondent may elect to introduce in addition to" the aforesaid third-party registrations and applications, citing Endo Products, Inc. v. Strong, Cobb and Company, Inc., 110 USPQ 100.

Thereafter respondent took the testimony of three of its officers, submitted its case, and the board, for reasons stated in a well-considered opinion, rendered the decision granting the petition to cancel from which this appeal was taken.

The board found that the goods of the parties are identical in kind; that shoe counters are stiffeners made of fiber board or plastic. As the record shows, and as is common knowledge, a shoe counter, to quote Webster's New Collegiate Dictionary, 2d Ed., is "A stiffener * * * to give form to a boot or shoe upper around the heel." As to the marks, the gist of the board's view is in the following excerpts from its opinion:

"As far as this record shows, only petitioner and respondent have adopted and used 'Melo' as parts of marks for shoe counters. Considering the marks, it is concluded that respondent's mark 'Melo-O-Top' so resembles petitioner's mark 'MELOFLEX', being applied to goods identical in kind, as to be likely to cause confusion or mistake or deception of purchasers.

" * * * even a discriminating purchaser might well assume that 'Mel-O-Top' and 'MELOFLEX' were trademarks on companion products of a single producer."

MARTIN, pursuant to provisions of Section 294(d), Title 28 United States Code.

After careful consideration of the entire record and of appellant's brief and oral arguments (appellee neither filed a brief nor appeared at the hearing), we are unable to find error in the board's decision or in its supporting reasoning.

*Error alleged with respect to the motion.*

Appellant's final assignment of error reads:

"8. And finally, the Board erred in failing to grant respondent's Motion for Judgment Under Rule 2.132 (b) filed on or about January 21, 1960."

Several pages of its brief are devoted to this alleged error which, although it involves merely a procedural point, we are urged to decide because of its supposed importance to Patent Office practice in trademark cases. Appellant appears to be of the belief that the board denied the motion simply because appellant submitted its notice that third-party registrations would be relied on. Whether the board denied the motion for that reason we do not say. It is clear that the board stated other and more cogent reasons for denying the motion.

Rule 2.132(b) gives the board discretionary powers to grant or deny motions for judgment thereunder. We think the facts of this case make it clear that the board did not abuse its discretion in acting as it did. Accordingly, we do not think that its action on appellant's motion should be disturbed.

The decision of the board granting the petition to cancel appellant's registration is affirmed.

Affirmed.

WORLEY, Chief Judge (dissenting).

*"It is well established that the burden of proof rests upon one who seeks to cancel a registered mark. * * *"* [James Huggins & Sons, Inc. v. Avenarius Bros. (Attorney General of the United States, substituted), 42 CCPA 1019, 223 F.2d 494, 106 USPQ 271.] (Italics supplied.)

*"In a cancellation proceeding, the situation is quite different* [from *ex parte* and opposition proceedings]. *The defendant in such proceeding is one who has obtained substantial rights from the Government upon or about which he may have built a large and, of course, legitimate business. The cancellation of one's trade-mark may prove destructive to the business built about it. Surely, no registration should be cancelled hastily and without a most careful study of all the facts."* [In re Malvina D. Myers, Etc., 40 CCPA 747, 201 F.2d 379, 96 USPQ 238]. (Italics supplied.)

*" * * * [I]n a cancellation proceeding, * * * where long established, valuable rights are involved, cancellation must be granted with due caution and only after a most careful study of all the facts."* [Sleepmaster Products Co., Inc. v. American Auto-Felt Corp., 44 CCPA 784, 241 F.2d 738, 113 USPQ 63]. (Italics supplied.)

The Patent Office granted registration of appellant's mark "Mel-O-Top" in 1956. Since that time appellant has built up a substantial business around that mark, reflected by sales of at least three million pairs of shoe counters annually. In 1959 appellee sought cancellation of appellant's mark alleging damage. The only proof of damage was submission of its registration, "Meloflex," also for use on shoe counters. Appellant's evidence consists of testimony of three of its principal officers, together with numerous exhibits.

The instant goods are not the usual run-of-the-mill items, sold side-by-side in over the counter fashion to the general public. On the contrary, they are made to specification, to fit and be built into various types and sizes of shoes; they are sold in large lots, generally by salesmen dealing *directly* with the shoe manufacturers or their purchasing agents. The counters *per se* are never seen by the ultimate purchasers of the shoes. Under such circumstances, and especially

in view of what must be a most discriminating purchaser, I see no likelihood of confusion.

The following excerpts taken from the testimony of appellant's witnesses, all veterans of many years in the shoe counter industry, are most illuminating and have not been challenged by appellee:

"Q12. Mr. Leavitt, tell us a bit more about the nature of the counter. What is it exactly? A. The description of a counter originally in England was called a stiffener. When a shoe is put together in a shoe factory, it has to have some piece of material, a piece of material in back of the shoe to hold around the ankle of the foot and at the same time must have a certain amount of flexibility on top without doing any harm to the back of the foot. *Once this is put into the shoe, it's never seen by the ultimate user or wearer of the shoes.*

"Q13. To whom are counters sold, Mr. Leavitt? A. *Counters are sold principally to shoe manufacturers.*

"Q14. You say 'principally,' sir. To whom else might they be sold? A. *Merker Counter does not sell to anyone else but shoe manufacturers.*

"Q15. Would you tell us in a few words, if you can, sir, the operation involved in the manufacture of a counter. A. There [are] approximately twelve distinct operations in the manufacture of a counter. Briefly, you start with the raw material, which is called a fibre board that we buy in sheet form, and we die them out with a steel die to various shapes and sizes for different types of shoes, such as men's, women's, children's and so forth.

\*    \*    \*    \*    \*

"The Witness: This particular piece of fibre is our Mel-O-Top material, *manufactured exclusively to our specifications.*

\*    \*    \*    \*    \*

"The Witness: This is called skiving or beveling. In this same operation there is a steel stamp roll with the markings or identification of the type, such as this particular one has Mel-O-Top to identify the same.

"Q17. Mr. Leavitt, there is a difference in size between Exhibits 1 and 2. Will you explain briefly what the reason for that is. A. Very simple. *That one goes to what we call a pocket shoe, which has a short lining, the shorter one, and the long one goes into an open lining shoe.*

\*    \*    \*    \*    \*

"Q35. Tell me in a few words *how you go about selling counters.* A. Well, *personal contact with the superintendent or the foreman in charge of the factory.*

"Q36. That is the manner in which you, as a person, have sold counters in the past. A. That's right.

"Q37. You've testified that you now sell counters for Merker Counter Company, and I ask you now are there any other salesmen employed by the company? A. There is. [sic]

\*    \*    \*    \*    \*

"Q41. And to the best of your knowledge, *do those* [three] *Gentlemen sell counters in the same way?* A. *They do.*

"Q42. *That is, by personal contact.* A. *They do.*

"Q43. Are there any other classes of people that you contact in making sales, Mr. Leavitt? A. Yes.

"Q44. Would you describe that class, briefly. A. Well, *owners or various shoe manufacturers.*

\*    \*    \*    \*    \*

"Q70. Mr. Leavitt, approximately how many companies in the United States manufacture counters, do you know? A. *About thirty-five or thirty-six.*

"Q71. Are they distributed through the country, sir, or are they concentrated in any particular area. A. Throughout the country.

"Q72. Could you estimate the relative position of Merker Counter Company in terms of the national total of companies. A. *We would consider ourselves in the group of the first six outstanding counter manufacturers throughout the country.*

"Q73. Would you care to state on the record the approximate number of counters which Merker Counter Company made last year? A. *Between fourteen and a half to fifteen million pairs.*

"Q74. If you know, sir, approximately how many of those were *sold under the Mel-O-Top mark?* A. At what time, sir?

"Q75. For the last year. A. The last year? *Better than four million pairs.*

"Q76. Do you have an idea as to *how many Mel-O-Top counters were sold in the preceding year; that is, 1958?* A. *Three million pairs, 1955; three million pairs in 1956; the same in 1957; and '58, three million pairs, approximately.*

"Q77. And can you give us some estimate as to your present production for this year? A. The first three months of 1960, we have produced 2,280,000 pairs.

\* \* \* \* \*

"Q99. I will ask you this question solely for the record, and the question is: *Are you aware of any confusion that has ever existed between Merker's Mel-O-Top and Central's Meloflex?* A. *None whatsoever.*

\* \* \* \* \*

"[Mr. Gordon] Q140. Were you able to ascertain whether or not the company expended any additional moneys in any type of advertising with respect to the Mel-O-Top trademark? A. Yes, sir. *We spent money on the Mel-O-Top mark for items such as steel roll stamps, used in stamping each counter that is produced by us, with the Mel-O-Top mark.* Also, money has been spent on *labels which are pasted on to every carton of counters and any package that goes out from our place with counters in them,* money has been spent for *printing on the boxes that the counters are packed in,* and money has been spent on *cuts for the printing on the cartons and for other advertising.*

\* \* \* \* \*

"Q156. Mr. Gordon, do you have anything to do with the sales aspect of the company's business? A. Yes.

"Q157. Do you sell? A. Yes, I do.

"Q158. *Approximately how much time do you spend outside the office selling?* A. *Half.*

\* \* \* \* \*

"Q167. Mr. Gordon, have you an opinion as to whether there is any likelihood of confusion resulting from the use of the mark Mel-O-Top and the alleged mark Meloflex? A. My opinion is that there is no possible confusion between the two marks." (All italics supplied.)

Thus, we have a situation where appellant has in good faith built a substantial business under its trademark, yet the record is completely silent regarding sales under appellee's mark. There is no evidence in the record of actual confusion during the several years of concurrent registration, nor, in my opinion, is there the remotest likelihood that there will be.

A registrant may, of course, rely only on his prior registration as proof of damage if he so chooses, but in so doing he necessarily runs the risk of failing to sustain his burden of proving that he will be damaged. In my opinion appellee has not proved he will be damaged

751

if appellant is allowed to continue its registration. On the contrary, it seems clear from this record that it will be the appellant, not the appellee, who will suffer damage if its mark is cancelled.